## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DESIREE B., | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-cv-8129 |
| | ) | |
| v. | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| ANDREW M. SAUL, Commissioner of the | ) | |
| Social Security Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Desiree B.[2] appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her disability benefits. The parties have filed cross motions for summary judgment.[3] As detailed below, Plaintiff's motion for summary judgment [dkt. 17] is GRANTED and the Commissioner's motion for summary judgment [dkt. 22] is DENIED.

## I.    Background

### a.    Procedural History

Plaintiff was born in 1968 and was 44 years old on her alleged disability onset date. [R. 38.] Plaintiff applied for Disability Insurance Benefits on June 25, 2013, alleging disability onset on the same day. [R. 128, 146.] On August 14, 2017, after two administrative hearings, Administrative Law Judge ("ALJ") Luke Woltering issued an unfavorable decision. [R 15-39.] Plaintiff requested Appeals Council review, which was denied on October 10, 2018. [R. 1-7.] Thus, the Decision of the Appeals Council is the final decision of the Commissioner. Plaintiff filed the instant action on December 11, 2018, seeking

---

[1]    As of June 4, 2019, Andrew M. Saul is the Commissioner of the Social Security Administration. Pursuant to Federal Rule Civil Procedure 25(d), he is hereby substituted as Defendant.

[2]    In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by her first name and the first initial of his last name(s).

[3]    Plaintiff has filed a Brief in Support of Reversing the Decision of the Commissioner of Social Security, which the Court construes as a motion for summary judgment [17].

review of the Commissioner's most recent decision. [Dkt. 1.]

### b. The ALJ's Decision

On August 14, 2017, the ALJ issued a written decision denying Plaintiff disability benefits. [R. 15-39.] At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 25, 2013. [R. 17-18.] At Step Two, the ALJ found that Plaintiff had the severe impairments of cervical degenerative disc disease; lumbar degenerative disc disease; right knee arthritis and meniscus tear; seizure disorder; affective disorder; asthma; sleep apnea; limited visual acuity and visual fields, including optic neuritis; multiple sclerosis ("MS"); and obesity. [R. 18.] The ALJ determined that Plaintiff's irritable bowel syndrome; obstructive sleep apnea; mild subchondral sclerosis of the left hip; and migraine headaches were nonsevere impairments. [R. 18-19.] At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart P, App'x 1. [R. 19-23.]

Before Step Four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with the following limitations: she cannot kneel or crawl, climb ladders, ropes or scaffolds; she can occasionally climb ramps and stairs, balance, stoop and crouch; she cannot work around hazard such as unprotected heights and exposed moving mechanical parts; she cannot perform jobs requiring far acuity or field of vision; she cannot tolerate concentrated exposure to extreme cold or extreme heat, humidity, dust, fumes, odors, or other pulmonary irritants; she needs a cane for walking and standing; she can carry out simple instructions and make simple work related decisions; she can adapt to simple routine changes and pressures in the work environment; and she can interact occasionally and superficially with coworkers and supervisors, but is to have no public interaction. [R. 23, 37.]

At Step Four, the ALJ determined that Plaintiff was not capable of performing her past relevant work as a social services aide or home health aide. [R. 37.] At Step Five, however, the ALJ found Plaintiff

capable of performing other jobs existing in significant numbers in the national economy. [R. 38.] Because

of these determinations, the ALJ found Plaintiff not disabled under the Act. [R. 39.]

## II.    Social Security Regulations and Standard of Review

The Social Security Act requires all applicants to prove they are disabled as of their date last insured

to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to

assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is

currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; and

(3) whether the severe impairment (or, in this case, the combination of impairments) meets or equals one

considered conclusively disabling such that the claimant is impeded from performing basic work-related

activities. 20 C.F.R. § 404.1520; 20 C.F.R. § 404.1523; 20 C.F.R. § 404.1545; 20 C.F.R. § 416.920(a)(4)(i)-

(v). While a "not severe" impairment standing alone may not significantly limit an individual's ability to

do basic work activities, it may—when considered with limitations or restrictions due to other

impairments—be critical to the outcome of a claim. S.S.R. 96-8p, 1996 WL 374184, *5 (July 2, 1996). If

the impairment(s) does meet or equal this standard, the inquiry is over and the claimant is disabled. 20

C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the

claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir.

1981). If not, the ALJ must (5) consider the claimant's age, education, and prior work experience and

evaluate whether she is able to engage in another type of work existing in a significant number of jobs in

the national economy. *Id.* At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the

claimant's RFC in calculating which work-related activities she is capable of performing given his

limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to

the Commissioner to show that there are jobs that the claimant is able to perform, in which case a finding

of not disabled is due. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

In disability insurance benefits cases, a court's scope of review is limited to deciding whether the

final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young*, 362 F.3d at 1001. Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). The Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also*, 42 U.S.C. § 405(g).

## III. Discussion

Plaintiff alleges the ALJ's RFC assessment is not supported by substantial evidence, arguing significant gaps in the requisite logical bridge between the ALJ's analysis of the evidence and his conclusions. We agree, and find the ALJ's opinion impermissibly internally contradictory with respect to Plaintiff's severe impairments of both multiple sclerosis ("MS") and her seizure disorder.

At the outset, it is important to understand what a severe impairment is: "[a] severe impairment is one that significantly limits an individual's ability to perform basic work activities." *Million v. Astrue*, 260 F. App'x 918, 922 (7th Cir. 2008); *see also*, 20 C.F.R. § 404.1520(c); SSR 16-3P. "A finding that an impairment is severe cannot square with a conclusion that it imposes no limitations. It is axiomatic that a severe impairment imposes limitations, and an impairment that imposes no limitations is not severe." *Pickens v. Berryhill*, 2019 WL 1219707, at *2 (E.D. Ark. Mar. 15, 2019); *see also*, *Mullin v. Colvin*, 2016 WL 2865366, at *3 (N.D. Ill. May 17, 2016) (remanding where ALJ found a severe impairment yet imposed no related limitations, failing to adequately explain "how Plaintiff's hand impairments could 'significantly

limit' his work abilities in her step two findings and, at the same time, have no impact on his capacity for work in her RFC finding"); *Amy L. v. Saul*, 2019 WL 4600262, at *5 (D. Minn. Sept. 23, 2019) (same). If an "impairment is considered to be severe, it must be included in the residual functional capacity assessment, and if it is not included, the ALJ's decision is impermissibly internally contradictory." *Hargis v. Sullivan*, 945 F.2d 1482, 1488 (10th Cir.1991); *see also*, *Givens v. Astrue*, 251 F. App'x 561, 567 (10th Cir. 2007) (same).

### a. Multiple Sclerosis

The ALJ determined Plaintiff's multiple sclerosis was a severe impairment, yet offered nothing within the RFC to accommodate the MS, instead chiefly noting the medical evidence that contradicted Plaintiff's account of her MS. Specifically, the ALJ noted with respect to the MS that "the claimant's diagnosis of MS is not entirely clear" [R. 20]; "the MRI showed *no evidence of MS*" [R. 25 (ALJ's emphasis)]; "[n]eurology findings were also unremarkable despite purported…MS" [*Id.*]; "the record is not entirely clear on the claimant's diagnosis of MS and whether it is based on objective findings" [R. 26]; "no clear evidence in the file during the relevant time period of MS flares" [*Id.*], "though (MS flare-up) symptoms were reported, none have been observed during the relevant time period by examining physicians" [R. 28]; treater "specifically indicated in this note the claimant continued to be a suspect for MS, but *did not have typical features* and was not on disease modifying agents" [R. 29 (ALJ's emphasis)]; and treater "noted it is 'very doubtful' that the claimant has an active demyelinating disorder (such as MS)" [R. 30]. In spite of this evidence (the ALJ's recitation of which, it seems to the Court, implies Plaintiff's MS was a fabrication – a subject about which we make no determination here), the ALJ still found Plaintiff's MS to be a severe impairment that imposed no limitations on Plaintiff's work abilities.

Either the ALJ believes Plaintiff's MS is a severe impairment, or it is nonexistent; the ALJ logically cannot have it both ways. *Hemminger v. Colvin*, 2016 WL 4926499, at *6 (N.D. Ind. Sept. 16, 2016) (unable to reconcile logical inconsistency in ALJ's apparent determination that Plaintiff's gallbladder issues were

severe and nonexistent at same time). This is because "[a] finding that an impairment is severe cannot square with a conclusion that it imposes no limitations. It is axiomatic that a severe impairment imposes limitations, and an impairment that imposes no limitations is not severe." *Pickens*, 2019 WL 1219707, at *2; *see also, Mullin*, 2016 WL 2865366, at *3 (remanding where severe impairment imposed no related limitations). A severe impairment, such as the ALJ found Plaintiff's MS here, that causes no limitations is internally contradictory and not supported by substantial evidence. We remand for this reason.

### b.    Seizures

Similarly, there is an irreconcilable logical inconsistency with the ALJ apparently determining that Plaintiff's seizures were both severe and nonexistent at the same time. *Hemminger*, 2016 WL 4926499, at *6. While the ALJ devoted roughly 5 pages of his opinion detailing his reasons for not adopting Plaintiff's account of her seizures, he ultimately determined her seizures were severe. The ALJ then allegedly included environmental restrictions to accommodate Plaintiff's seizure disorder, but did not specify which of the environmental limitations within his RFC are related to her seizures as opposed to another ailment from her constellation of impairments. [R. 36 ("[s]he is limited in terms of environment to accommodate seizure disorder…".][4]

However, it seems the ALJ focused more on whether Plaintiff was truthfully reporting her experience to her doctors and in her testimony, instead of determining whether Plaintiff's seizure disorder affects her ability to work. At step two, the ALJ found that Plaintiff's seizures were part of a severe combination of impairments. At step four, though, he seemed to imply that she did not actually suffer seizures when he addressed the specifics of her "episodes" and "suspected pseudoseizures," despite the

---

[4]    The full sentence reads: "[s]he is limited in terms of environment to accommodate seizure disorder, as well as accommodated in use of a cane though the file is inconsistent in whether this is medically necessary." [R. 25.] Not only is the Court at a loss regarding which specific environmental limitations accommodate Plaintiff's seizures, but the Court is further confounded as to whether the cane accommodates Plaintiff's seizure disorder and, if so, how exactly a cane would have accommodated a seizure disorder. *See also*, Section III(c), *infra*. The Court is even less certain the cane is a seizure accommodation when the ALJ accommodates Plaintiff's musculoskeletal complaints – bulging spinal disc, knee pain from degenerative joint space narrowing and a lateral meniscus tear, and left arm paresthesias – through use of a cane. [R. 29-30].

undisputed record of years of treatment for seizures, including with seizure prevention prescription medications.[5, 6] While the etiology of Plaintiff's episodes is unknown [R. 27, 674], it is apparent Plaintiff has them, has reported having them to her treatment providers (who are, in turn, treating her for them using anti-seizure medications), her family members and at least one physician have witnessed them,[7] and she experienced two of them in the ALJ's presence.[8] While the ALJ notes the record "contains questionable information as to the nature of the claimant's alleged seizures and whether the activity actually constitutes seizure activity" including "episodes of rapid blinking of the eyes, which [Plaintiff] believed may be seizures" [R. 27], either Plaintiff has a severe seizure disorder or she experiences episodes that cannot be medically classified as a seizure. The ALJ cannot have it both ways. Despite the ALJ finding Plaintiff's seizures "severe," it is clear from his detailed explanation that the ALJ did not accept Plaintiff's account of the effects of her seizures. However, even if the ALJ did not mean to imply that Plaintiff had no seizures, his analysis of the seizure evidence is problematic. *See Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014), as amended on denial of reh'g (Oct. 24, 2014).

Substantial evidence in the record supports the following about Plaintiff's seizure episodes: Plaintiff reported that in 2013 she was having seizures about 15 times per week. [R. 108.] At the 2016 hearing, she reported having them about 4 times a week. [R. 110.] Plaintiff had two seizures during the 2016 hearing. [R. 112-14.] By 2017, she reported she was having seizures nearly every day. [R. 54.] She reported that

---

[5]    It appears the ALJ adopts the language of one of Plaintiff's treatment providers who classified Plaintiff's diagnoses as "suspected pseudoseizures," but the ALJ neglected to mention that the entire phrase from the medical note reads that Plaintiff has "been diagnosed as seizures *and* possible pseudoseizures." [R. 764 (emphasis added).]

[6]    There is some debate whether Plaintiff is compliant with her seizure medications [R. 25, 28; dkt. 17, p. 11; dkt.23, pp. 7-8], but the fact remains that Plaintiff's treaters continue to treat her, in part, by prescribing these medications.

[7]    Relatedly, the ALJ alternately and confusingly notes both that there is no documentation of a seizure happening when Plaintiff is in the presence of a treatment provider [20], and that Plaintiff had an episode while being examined by Dr. Ahmad [R. 27] (although Dr. Ahmad noted that this did not appear to be seizure phenomenon).

[8]    It is perhaps nowhere more apparent to the Court that the ALJ seemed to imply that Plaintiff did not actually suffer seizures than in the ALJ's treatment in his opinion of the *two* seizures Plaintiff had *during* her initial administrative hearing. [R. 112-14.] Not only did the ALJ only mention one of the two seizures, but as to the one he mentions, he downplays it to such an extent you would never know he personally witnessed it, writing merely that "[Plaintiff] indicated she had a seizure during the hearing." [R. 24.] The second seizure he fails to mention at all in his opinion.

her seizures lasted about 5 to 10 minutes.[9] [R. 55.] Plaintiff's son testified that after a seizure, it takes Plaintiff an hour or two to return to a completely normal state, but during that time she will be able, with difficulty, to respond to questions.[10] [R. 115.] Typically, after a seizure, she had a headache and just wanted to go to sleep. [R. 57.] Thus, at a minimum, she would have a seizure, interrupting work, at least 4 times per week, which would last at least 5 minutes, after which she had a headache and needed to sleep for an hour or two. That certainly would affect Plaintiff's ability to perform tasks at work (particularly since she was "off task" for more than 15% of the 2016 Administrative Hearing, which the VE testified is the maximum allowable off-task time). [R. 123.]

This evidence seems to contradict that notion that Plaintiff's seizure disorder was a severe impairment that could be accommodated solely by *unspecified* environmental limitations (even with a cane, *see* fn. 4). *See Mullin*, 2016 WL 2865366, at *3. An impairment with these characteristics might indeed be accommodated by environmental limitations, however, the Court is ultimately unable to review the ALJ's conclusions as to the Plaintiff's RFC seizure limitations because the ALJ did not tie any potential environmental limitations to Plaintiff's seizures. Ultimately, the ALJ did not build the logical bridge allowing us to agree that Plaintiff's seizures were not as grave as alleged, which warrants remand for a more robust evaluation of the effects of Plaintiff's seizures and the specific limitations, if any, stemming

---

[9]    While the Court is unable to tell how long the seizure episodes lasted during the initial administrative hearing, Plaintiff was unable to continue her testimony after the second seizure because her "postictal state" rendered her unable to answer further questions. [R. 114.] As to timing, the first seizure occurred and Plaintiff's son was brought into the room to assist and the hearing goes off the record. [R. 113.] Some time later the hearing resumes for two questions and then is stopped due to technical difficulties. [*Id.*] When the record resumes some 15+ minutes later, the ALJ states, "while we were off the record, the claimant had another seizure…" [R. 112-14.] We do know that Plaintiff suffered two seizure episodes in under an hour (start time of 8:44 a.m. until resumption of testimony at 9:31 a.m.), and that it took her "quite a bit of time to get back to consciousness." [R. 123-24.]

[10]    The Court finds it wholly incredible that the ALJ discounts Plaintiff's son's testimony as "not entirely reliable" because he "is not medically trained" to observe, *inter alia*, dates or frequencies of his mother's seizures and whether his mother has unusual moods or mannerisms surrounding her seizures. [R. 36.] It strains reason to think a family member would need medical training to testify to these metrics, particularly since "[t]estimony such as this from family members and employers who were in a position to observe the claimant's symptoms and daily activities is competent and probative evidence." *Herron v. Comm'r of Soc. Sec.*, 788 F. Supp. 2d 809, 817 (N.D. Ind. 2011) (citing 20 C.F.R. § 404.1529(a) & (c)(3); *Boiles v. Barnhart*, 395 F.3d 421, 424-26 (7th Cir. 2005); *Barnett v. Barnhart*, 381 F.3d 664, 668-70 (7th Cir. 2004); *Godbey v. Apfel*, 238 F.3d 803, 809-10 (7th Cir. 2000)).

therefrom; we do not find the ALJ's analysis of the evidence related to Plaintiff's seizures is logically connected to his determination of her residual functional capacity.

Remand will allow the ALJ to meaningfully evaluate what limits in functioning or performing basic work activities Plaintiff did have due to her severe seizure disorder given the frequency, duration, intensity, or after-effects of her symptoms (including, but not limited to, whether Plaintiff could resume work after a seizure, and if so, how long post-seizure she could resume work). If the answer once again is that environmental limitations will indeed accommodate Plaintiff's severe seizure disorder, the ALJ needs to specify exactly which environmental restrictions will suffice; if the answer is that Plaintiff's "pseudoseizure" episodes do not affect Plaintiff's work-life functioning, her seizure disorder should not be classified as a severe impairment.

### c. Cane

Lastly, we are concerned about the ALJ's adoption, without the requisite explanation, of cane usage in the sedentary RFC he crafted for Plaintiff. Indeed, as the Commissioner suggests, the ALJ's finding of sedentary work with use of a cane was generous compared to most of the medical opinions in this matter. *See* dkt. 23, p. 3. However, this is exactly the issue: while generous to Plaintiff, it appears the ALJ impermissibly assessed a middle-ground physical RFC without a medical basis. *See, inter alia, Norris v. Astrue*, 776 F. Supp. 2d 616, 637 (N.D. Ill. 2011) ("ALJs are not permitted to construct a 'middle ground' RFC without a proper medical basis"); *Bailey v. Barnhart*, 473 F.Supp.2d 822, 838-39 (N.D.Ill. 2006).

On one hand, Plaintiff's treating physician offered opinions that amounted to Plaintiff being able to perform less than sedentary work and no full-time work, and that she needed a cane for even occasional standing or walking. [R. 951-52.] On the other hand, both non-examining State agency medical consultants found Plaintiff capable of light work and a nearly full ability to walk and stand (6 out of 8 hours in a normal workday); neither consultant required use of a cane at all. [R. 137-39, 159-61.] The ALJ adopted *no* opinion of record and limited Plaintiff to sedentary work with a cane for walking and standing,

9

ultimately finding that Plaintiff could perform more than her doctors opined, but less than the agency doctors opined. [R. 23.] By rejecting all medical opinions of record, the ALJ created an evidentiary deficit which he needed to remedy by pointing to specific evidence to substantiate his conclusion. *Suide v. Astrue*, 271 Fed. Appx. 684, 689-90 (7th Cir. 2010). Basically, it was the ALJ's duty to: (1) develop the record to a sufficient degree to enable him to construct a reasonable RFC based on objective evidence (including, if necessary, calling a medical advisor and/or obtain clarification of the record); and (2) articulate clearly how and why that finding was reached. *Bailey v. Barnhart*, 473 F. Supp. 2d 842, 849-50 (N.D. Ill. 2006). The ALJ did neither of these things, instead constructing an unsupported RFC assessment based on the "middle ground" between two existing RFCs without any explanation. *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008) (no logical bridge created where ALJ recited medical evidence but did not analyze it). This is particularly problematic because the middle-ground cane usage is a physical RFC assessment. *See Bailey*, 473 F. Supp. 2d at 838 (reversing, in part, because ALJ "disagreed with all physical RFCs in the record, constructed a 'middle ground' and came up with her own physical RFC assessment.") The middle ground RFC assessment was not a reasonable way to resolve the conflicting medical record, or to compensate for any lack of evidence.[11] We remand for this reason as well.

## IV. Conclusion

For the foregoing reasons, the Court must reverse and remand for proceedings consistent with this Memorandum Opinion and Order. At this time, the Court offers no opinion as to the other alleged bases of error in the ALJ's decision as raised by Plaintiff. Plaintiff's motion for summary judgment [dkt. 17] is GRANTED and the Commissioner's motion for summary judgment [dkt. 22] is DENIED.

Entered: 11/19/2019

_____
Susan E. Cox,
United States Magistrate Judge

---

[11]   It appears there were approximately 2.5 years of medical records the State agency consultants did not consider providing their opinions, as the agency doctors last reviewed the file in February 2015 [R. 139, 162] and the most recent hearing was in July of 2017, with the ALJ issuing his decision on August 9, 2017.